13 CIV 6694

Sanjay Wadhwa
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center, Suite 400
New York, New York 10281
(212) 336-0181

RECEIVED
SEP 23 2013
U.S.D.C. S.D. N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, : | |
| : | |
| Plaintiff, : | **COMPLAINT** |
| : | |
| -against- : | **ECF CASE** |
| : | |
| LAWRENCE J. ROBBINS, : | |
| : | |
| Defendant. : | |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Lawrence J. Robbins ("Robbins"), alleges as follows:

## SUMMARY

1.     This case involves an insider trading scheme that generated over $2.6 million in illicit profits from trading in advance of two acquisition announcements. The scheme involved Robbins, Robbins's friend and business partner, John Michael Bennett ("Bennett"), a former securities industry professional; and Bennett's friend, Scott Allen ("Allen"), a former Principal of a leading global human resources consulting firm.

2.     Through his work, Allen obtained material, nonpublic information ("inside information") in advance of: (i) the April 10, 2008 announcement that Takeda Pharmaceutical Company ("Takeda") had agreed to acquire Millennium Pharmaceuticals,

Inc. ("Millennium") through a cash tender offer; and (ii) the September 3, 2009 announcement that Dainippon Sumitomo Pharma Co. Ltd. ("DSP") had agreed to acquire Sepracor Inc. ("Sepracor") through a cash tender offer. In both instances, Allen misappropriated the inside information from his employer and its clients in breach of the duty of confidentiality he owed to them by tipping Bennett, who, in turn, shared the information with his friend and business partner, Robbins. After receiving this information, Robbins and Bennett traded prior to the public announcements of the acquisitions, and collectively reaped over $2.6 million in ill-gotten profits. The trades made by Robbins alone generated over $1.5 million in ill-gotten profits.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

3.      The Commission brings this action pursuant to the authority conferred upon it by Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78u(d)]. The Commission seeks a permanent injunction against Robbins, enjoining him from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint, and disgorgement of all ill-gotten gains from the unlawful insider trading activity set forth in this Complaint, together with prejudgment interest. The Commission also brings this action pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1] for civil penalties against the defendant under the Insider Trading and Securities Fraud Enforcement Act of 1988. Finally, the Commission seeks any other relief the Court may deem appropriate pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)].

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over this action pursuant to Sections 21(d),

21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

5.     Venue lies in this Court pursuant to Sections 21(d), 21A, and 27 of the

Exchange Act [15 U.S.C. §§ 78u(d), 78u-1 and 78aa].  Certain of the acts, practices,

transactions, and courses of business alleged in this Complaint occurred within the

Southern District of New York.  Robbins worked at various businesses that maintained

offices in New York, New York, and resided in New York, New York.  In addition, many

of the communications in furtherance of the insider trading alleged in this Complaint

were made from, to, or within the Southern District of New York.

## DEFENDANT

6.     **Robbins**, age 52, resides in New York, New York.  From at least January

2008 to January 2011, Robbins was a co-owner with Bennett of an independent film

production company.  Prior to forming the independent film production company in

October 2007, Robbins was a partner at an accounting firm.

## RELEVANT INDIVIDUALS AND ENTITIES

7.     **Allen**, age 47, resides in Atlanta, Georgia, and was a Principal of a leading

global human resources consulting firm headquartered in New York, New York, until

October 2010.  From at least February 2008 to October 2010, Allen conducted business

from his employer's New York and Atlanta offices in its private equity and acquisitions

business.

8.      **Bennett**, age 50, resides in Norwalk, Connecticut.  Prior to co-founding an independent film production company with Robbins in 2008, Bennett worked for a major Wall Street investment bank from 2005 to 2007.

9.      **Takeda** is a Japanese pharmaceutical company, headquartered in Osaka, Japan.

10.     **Millennium**, originally formed as a Delaware corporation in 1993, is a biotechnology company that was registered with the Commission pursuant to Section 12(b) of the Exchange Act until it was acquired by Takeda on May 14, 2008.  Until May 2008, Millennium's common stock traded on the Nasdaq, and it filed periodic reports, including Forms 10-K and 10-Q, with the Commission pursuant to Section 13(a) of the Exchange Act.

11.     **Sepracor**, a Delaware corporation, is a biotechnology company headquartered in Marlborough, Massachusetts, that was registered with the Commission pursuant to Section 12(b) of the Exchange Act until it was acquired by a wholly-owned subsidiary of DSP on October 20, 2009.  Until 2009, Sepracor's common stock traded on the Nasdaq, and it filed periodic reports, including Forms 10-K and 10-Q, with the Commission pursuant to Section 13(a) of the Exchange Act.

12.     **DSP** is a Japanese pharmaceutical company, headquartered in Osaka, Japan.

## CALL OPTIONS AND PUT OPTIONS

13.     Equity call options give the buyer the right, but not the obligation, to purchase a company's stock at a set price (the "strike price") for a certain period of time (through "expiration").  In general, one buys a call option when the stock price is

expected to rise, or sells a call when the stock price is expected to fall. For example, in February or March, 2008, one "April $17.50" call option on Millennium stock would give the purchaser the right to buy 100 shares of Millennium stock for $17.50 per share before the call expired on April 19, 2008 (options generally expire on the third Friday of the expiration month). If Millennium stock went above $17.50 per share before the call option expired, the call owner could either exercise the call option and acquire the stock at $17.50, or sell the call option, which would have increased in value. If Millennium's stock price failed to reach the $17.50 strike price before the call option expired and the holder had not sold the option, the call would expire worthless. If at the time of purchase of the option, the call option strike price is above the price at which the stock is then trading, the call option is "out-of-the-money," because it would be unprofitable to exercise the call option and pay more for the stock than if the stock were purchased on a stock market.

14.     Equity put options give the buyer the right, but not the obligation, to sell a company's stock at the strike price prior to expiration. In general, one buys a put option when the price is expected to fall, or sells a put option when the stock price is expected to rise. Thus, the seller of a put option receives the proceeds of the sale of the put option in return for undertaking the risk that the value of the stock will decline. If the stock price of the security does not fall below the strike price, the put option expires and the proceeds of the put option sale constitute profits for the seller.

## FACTS

**A.**   **The Relationship Between Robbins, Bennett, and Allen**

15.   Robbins had a close relationship with his business partner, Bennett. Between January 2008 and January 2011, Bennett and Robbins worked closely together on a daily basis and had desks in the same room.  In addition, they participated in charitable activities together and trained for and participated together in cycling events.

16.   Bennett, in turn, was close friends with Allen, whom he had known since the early 1990s.  Bennett was an usher at Allen's wedding in the mid-1990s and listed Allen as an executor of his estate in a will he prepared in October 2008.

**B.**   **Insider Trading Policies of Allen's Employer**

17.   From at least January 2008 through at least October 2010, Allen's employer maintained policies prohibiting its employees from using confidential information received during their work on behalf of its clients to trade in any security or to advise other people to trade in securities based on such nonpublic information.  The policies also prohibited all employees from disclosing confidential client information to anyone outside the firm.

18.   Despite this duty, as detailed below, Allen misappropriated and disclosed his employer's clients' inside information to reap personal benefit and to benefit his close friend Bennett.

**C.**   **Insider Trading in Millennium Securities**

**Takeda's Nonpublic Acquisition Discussions with Millennium**

19.   In or about January 2008, representatives of Takeda and Millennium began negotiating a possible acquisition by Takeda of Millennium.  Takeda made a

nonpublic written offer to buy Millennium's outstanding shares for $23 per share on February 1, 2008. Between February 1, 2008, and April 9, 2008, representatives of Takeda and Millennium along with their advisors conducted nonpublic negotiations and due diligence. During these nonpublic discussions, Millennium's stock traded at prices between $12.82 and $16.35 per share.

### Allen's Receipt of Confidential, Nonpublic Information

20.     Allen obtained nonpublic information concerning Takeda's offer to acquire Millennium in February 2008. On or about February 13, 2008, Allen's employer began advising Takeda in connection with Takeda's negotiations with Millennium. Allen was one of the employees at his firm who knew about Takeda's negotiations with Millennium, having first been informed about his employer's work for Takeda on or around February 14, 2008.

### Allen Tips Bennett, and Bennett and Robbins Purchase Millennium Securities

21.     On or before February 28, 2008, Allen provided Bennett with inside information concerning Takeda's impending cash tender offer to acquire Millennium's shares.

22.     Between February 14, 2008, when Allen received the inside information about Takeda's proposed acquisition of Millennium, and February 28 and 29, 2008, when Robbins and Bennett began trading Millennium's securities, Allen communicated numerous times with Bennett.

23.     For example, at 7:40 pm, on February 27, 2008, Allen received an email from a representative of Takeda stating that the contemplated offer was for "23, potentially 24 per share." Four minutes later, at 7:44 pm, there was a two-minute call

placed from Allen's cell phone to Bennett's cell phone, followed by two additional phone calls between Allen and Bennett, at 8:56 pm and 8:57 pm. Later that night, at 10:01 pm, there was a 26-minute phone call between Bennett and Robbins.

24.     Similarly, on February 28, 2008, Allen sent an email to a colleague indicating that Takeda "raised the tender offer price to $25." That day, Allen travelled from New York to Atlanta, and, at 10:13 pm, there was a phone call placed from Allen's home number (in Atlanta) to Bennett's cell phone lasting approximately nine minutes. Shortly after ending his call with Allen, Bennett called Robbins's cell phone from his cell phone. This call lasted approximately three minutes.

25.     Allen tipped Bennett with inside information regarding Takeda's impending acquisition of Millennium. In doing so, Allen misappropriated the inside information from his employer, and his employer's client, Takeda, concerning Takeda's plans to acquire Millennium.

26.     Bennett, in turn, tipped Robbins with inside information regarding Takeda's impending acquisition of Millennium on or before February 28, 2008. During February and March 2008, Bennett and Robbins maintained an office in Midtown Manhattan, and worked in the same room. In addition to working in close physical proximity, during this timeframe, Bennett and Robbins often spoke by telephone multiple times a day.

27.     As detailed further below, after receiving this information, both Bennett and Robbins traded Millennium securities, including purchasing more than 3,400 out-of-the-money call options.

*Bennett's Millennium Securities Transactions*

28.     Bennett traded on the basis of the inside information provided by Allen by purchasing Millennium call options in an account he held jointly with his wife at TD Ameritrade.  Between February 29 and April 2, Bennett invested over $17,100 to purchase 1,090 out-of-the-money Millennium call options.

29.     Bennett maintained communication with Allen while purchasing these Millennium securities.  For example, Bennett and Allen had telephone calls on the first three days that Bennett purchased Millennium call options: Friday, February 29, 2008; Monday, March 3, 2008; and Wednesday, March 5, 2008.

*Robbins's Millennium Securities Transactions*

30.     Robbins learned the inside information concerning Millennium from Bennett and traded on the basis of it beginning on February 28, 2008.

31.     In an account at E*Trade, Robbins purchased a total of 700 shares of Millennium stock on Thursday, February 28 (500 shares) and Friday, February 29 (200 shares), with an average price of $14.32 per share.  In an account at Merrill Lynch, Robbins purchased a total of 2,351 out-of-the-money call options between Friday, February 29, 2008 and Thursday, March 6, 2008.  Specifically, Robbins purchased: (i) 125 May $17.50 call options and 75 May $15 call options on Friday, February 29; (ii) 1,100 May $20 call options on Monday, March 3; (iii) 751 May $20 call options on Wednesday, March 5, 2008; and (iv) 300 May $20 call options on Thursday, March 6, 2008.

32.     All of the call options Robbins purchased had a strike price above Millennium's share price, which never closed at a price above $14.11 between February

29 and March 6.  The $20 strike price for all but 200 of these call options was more than

$5.50 — more than 35% — above the highest Millennium share price traded during this

time frame.  In total, between February 28 and March 6, 2008, Robbins invested over

$46,100 in Millennium call options and stock.

33.     Robbins sold a total of 270 January 2009 put options between Friday

February 29, 2008 and Wednesday March 5, 2008, giving his counter-party the right to

sell Millennium shares to him for $10.  The over $17,500 of proceeds from these sales

were placed in Robbins's E*Trade Account.

34.     Robbins's purchases of out-of-the-money call options were his first

options transactions in his Merrill Lynch account since he opened the account in

November 2007.  Robbins did not obtain authorization to trade options in this Merrill

Lynch account until Friday February 29, 2008, the first day he purchased Millennium call

options.

35.     Like Bennett, Robbins purchased Millennium call options on February 29,

March 3, and March 5 — days that Bennett and Allen had telephone calls.  Robbins's

Millennium stock purchases in his E*Trade account on February 28 and February 29, and

all of Bennett's Millennium option purchases, were placed from a single IP address

assigned to Bennett's and Robbins's Midtown Manhattan office location and registered to

Robbins, meaning that these trades were placed from the same computer or computers

using the same internet connection.

**The Millennium Acquisition Announcement and Subsequent Sales by
Robbins and Bennett**

36.     Millennium and Takeda announced Takeda's tender offer acquisition of

Millennium on Thursday, April 10, 2008, prior to the opening of the U.S. securities

markets, by issuing a joint press release.  The announcement, among other things, stated that "Takeda will acquire Millennium for approximately $8.8 billion through a cash tender offer of $25.00 per share."  Following this announcement, the price of Millennium's shares rose from $16.35 (the closing price on April 9) to $24.34 (the closing price on April 10), an increase of 48.87%.

37.     On April 10, Robbins sold 1,150 of the call options in his Merrill Lynch account — almost half of his position — for proceeds of over $514,000.

38.     Also, on the afternoon of April 10, Bennett sold his entire position of 1,090 call options from the TD Ameritrade account he jointly held with his wife for proceeds of over $619,500.

39.     On Monday April 14, 2008, Robbins transferred the remaining 1,201 call options in his Merrill Lynch account to his E*Trade account, and then sold these call options on Tuesday April 15 for proceeds of over $618,200.  The sale of these options was the first option transactions in Robbins's E*Trade account since at least July 1, 2007.  Robbins did not obtain authorization to trade options in his E*Trade account until Friday April 11, 2008, the trading day prior to the day he transferred the Millennium call options to this account.

40.     In total, Robbins made over $1.12 million in ill-gotten profits from his Millennium investments and Bennett made over $602,400 in ill-gotten profits from his Millennium investments.

**D.     Insider Trading in Sepracor Securities**

41.     A little over a year after their Millennium trades, starting in May 2009, Robbins and Bennett again placed option transactions in the securities of another

pharmaceutical company, Sepracor.  Once again, Bennett and Robbins traded in the

securities of an issuer for which Allen was privy to inside information regarding an

impending acquisition through his employer.  These trades included the purchase of

1,950 out-of-the-money Sepracor call options.

### DSP's Nonpublic Acquisition Discussions with Sepracor

42.     In the first several months of 2009, DSP retained financial advisors and

took other steps in preparing to approach Sepracor regarding a potential transaction.

Representatives of DSP first approached Sepracor's management about a potential

transaction on May 27, 2009.  Between May 27, 2009 and September 2, 2009, DSP and

Sepracor along with their advisors conducted nonpublic negotiations and due diligence.

During these nonpublic discussions, Sepracor's stock traded at prices between $15.05 and

$18.59.

### Allen's Receipt of Confidential, Nonpublic Information

43.     Allen obtained nonpublic information concerning DSP's intention to make

an offer to acquire Sepracor from his employer.  In May 2009, Allen's employer advised

DSP in connection with DSP's potential acquisition of Sepracor's outstanding shares.  By

May 26, 2009, Allen was participating in his employer's due diligence work for DSP in

connection with the Sepracor acquisition.

### Allen Tips Bennett, and Bennett and Robbins Purchase Sepracor Securities

44.     On or before May 27, 2009, Allen provided Bennett with inside

information concerning DSP's impending cash tender offer to acquire Sepracor's shares.

*Bennett's Sepracor Securities Transactions*

45.     Bennett traded on the basis of the inside information provided by Allen by purchasing Sepracor call options and selling Sepracor put options in a joint account he held with his wife at E*Trade.

46.     From May 27, 2009 to July 22, 2009, Bennett spent over $226,000 purchasing 1,700 Sepracor call options.  The $17.50 strike price on 1,300 of the 1,700 Sepracor call options Bennett purchased was over $1.00 above Sepracor's closing price on each of the days that Bennett purchased the options.

47.     Between May 27 and June 3, 2009, Bennett also sold 250 October put options, giving his counter-party the right to sell Sepracor shares to him for $15, and sold 100 January 2010 put options giving his counter-party the right to sell Sepracor shares to him for $15 on May 28, 2009.  The over $61,000 of proceeds generated by these sales were placed in Bennett's and his wife's joint E*Trade account.

*Robbins's Sepracor Securities Transactions*

48.     After receiving the inside information concerning DSP's potential acquisition of Sepracor from Allen, Bennett, in turn, tipped Robbins on or before May 27, 2009.  Robbins traded on the basis of this information by purchasing Sepracor call options and stock and by selling Sepracor put options in an account at E*Trade.

49.     Robbins purchased: (i) 50 October $15 call options on May 27, 2009; (ii) 100 October $17.50 call options and 100 January 2010 $15 call options on May 28, 2009; (iii) 240 October $17.50 call options on May 29, 2009; (iv) 60 October $17.50 call options on June 1, 2009; (v) 1,000 common shares of Sepracor on June 2, 2009; (vi) 50 October $17.50 call options on June 4, 2009; and (vii) 200 October $17.50 call options on

July 22, 2009. The $17.50 strike price on 650 of these 800 call options Robbins purchased was over $1.00 above Sepracor's closing price on each of the days that Robbins purchased the options. In total, Robbins spent over $127,000 to purchase Sepracor call options and Sepracor stock.

50.    Robbins sold, on May 27, 2009, 50 October put options, giving his counter-party the right to sell Sepracor shares to him for $15, and on May 28, 2009, 100 January 2010 put options that also gave his counter-party the right to sell Sepracor shares to him for $15. The over $31,000 of proceeds generated by these sales were placed in Robbins's E*Trade account.

51.    Certain of Bennett's and Robbins's trades in Sepracor securities were placed on the same day and from the same IP address.

**The Sepracor Acquisition Announcement and Subsequent Sales by Bennett and Robbins**

52.    DSP and Sepracor announced DSP's tender offer acquisition of Sepracor on September 3, 2009, prior to the opening of the U.S. securities markets, by issuing a joint press release. The press release, among other things, stated that "DSP will acquire Sepracor for approximately $2.6 billion through a cash tender offer of $23.00 per share, followed by a merger to acquire all remaining outstanding Sepracor shares at the same price paid in the tender offer." Following this announcement, the price of Sepracor's shares rose from $18.03 (the closing price on September 2) to $22.80 (the closing price on September 3), an increase of over 26%.

53.    After the announcement concerning Sepracor, both Robbins and Bennett sold their entire positions in Sepracor. In total, Robbins made over $388,000 in ill-gotten

profits from his Sepracor investments and Bennett made over $516,000 in ill-gotten profits from his Sepracor investments.

**E.    Allen Received a Benefit for Tipping Bennett**

54.    Allen provided inside information to Bennett with the expectation of receiving a personal benefit.  This benefit included money that Bennett paid Allen.

55.    Between April 21, 2008 and August 16, 2010, that is, after the April 10, 2008 Millennium announcement and continuing after the September 3, 2009 Sepracor announcement, Bennett made at least 27 cash withdrawals between $1,500 and $8,000 for a total of over $150,000.

56.    Between April 2008 and March 2009, Allen regularly travelled by subway to meet Bennett near Bennett's office on the same day as Bennett withdrew cash.

57.    For example, on July 1, 2008, Bennett withdrew $5,200 from a Citibank branch located near his office at 10:52 am.  Allen swiped his Metrocard at the 47-50 Rockefeller Center subway stop (the subway stop closest to Allen's office) at 12:36 pm and then again at the 59 Street Columbus Circle subway stop (the subway stop closest to Bennett's office) at 1:54 pm.  Also on July 1, 2008, Allen had an appointment on his Outlook Calendar for 1 pm entitled "BR @ 1," and Bennett had a $106.80 credit card charge at Blue Ribbon Sushi, a restaurant located in the Time Warner Center at Columbus Circle.

58.    Similarly, on December 11, 2008, Bennett withdrew $5,500 from a Citibank branch located at 4 Columbus Circle at 1:27 pm.  That same day, Allen swiped his Metrocard at the 47-50 Rockefeller Center subway stop at 1:30 pm and then again at the 59 Street Columbus Circle subway stop at 1:54 pm.

59.     Moreover, even after Bennett's office moved to another location in Manhattan in mid-March 2009, Allen and Bennett continued to meet on the same day as Bennett withdrew cash. In fact, on four separate occasions after mid-March 2009, Allen and Bennett used their Metrocards at the exact same time and location on the same day that Bennett withdrew $5,000 or more of cash from his bank accounts.

60.     For example, on October 15, 2009, Bennett withdrew $7,000 from a Citibank branch located at 4 Columbus Circle at 12:36 pm. A little over an hour later, at 1:42 pm, Allen and Bennett both swiped their Metrocards at the 59 Street Columbus Circle subway stop.

61.     Similarly, on May 18, 2010, Bennett withdrew cash from a Chase branch located near Columbus Circle at 1:21 pm. Three minutes later, at 1:24 pm, both Allen and Bennett swiped their Metrocards at the 59 Street Columbus Circle subway stop.

**F.      Bennett Received a Benefit for Tipping Robbins**

62.     In addition to the profits from his own illicit trades, Bennett also received a personal benefit for tipping Robbins. After the profitable transactions in Millennium described above, Robbins paid money to Bennett through the independent film production company jointly owned by Bennett and Robbins.

63.     On May 12, 2008, approximately a month after the announcement that Takeda would purchase Millennium's outstanding shares, Robbins transferred $240,000 from his E*Trade account to his personal bank account and instructed his accountant to send these funds to the independent film production company's bank account. This $240,000 was then paid from this bank account to Bennett between May 19, 2008 and December 12, 2008.

64.     The operating agreement for the independent film production company (the "Operating Agreement") dated May 12, 2008, labeled this $240,000 payment as a "Guaranteed Payment." The Operating Agreement stated specifically that this payment would not be deemed to be a distribution and not charged against Bennett's capital account. The Operating Agreement did not provide for Robbins to receive any similar payment.

65.     Robbins also made other substantial investments in the independent film production company.

## CLAIMS FOR RELIEF

### CLAIM I
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder

66.     The Commission realleges and incorporates by reference paragraphs 1 through 65, as though fully set forth herein.

67.     The information concerning Takeda's acquisition of Millennium and DSP's acquisition of Sepracor provided by Allen to his immediate tippee Bennett was, in each case, material and nonpublic. In addition, the information was, in each case, considered confidential by Allen's employer and its clients, and Allen's employer had policies protecting its own and its clients' confidential information.

68.     The material nonpublic information concerning Millennium and Sepracor was provided by Allen to Bennett in breach of the fiduciary duty that Allen owed to his employer, and Allen provided the information to Bennett with the expectation of receiving a benefit from doing so.

69.     Bennett tipped Robbins material nonpublic information concerning Millennium and Sepracor with the expectation of a benefit from doing so, and Bennett

knew, recklessly disregarded, or should have known, that the information was conveyed in breach of a fiduciary duty, or obligation arising from a similar relationship of trust and confidence.

70.     Robbins knew, recklessly disregarded, or should have known, that the information that he received concerning Millennium and Sepracor was disclosed or misappropriated in breach of a fiduciary duty, or similar relationship of trust and confidence.

71.     By virtue of the foregoing, Robbins, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce, or of the mails, or a facility of a national securities exchange, directly or indirectly: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices or courses of business which operated or would have operated as a fraud or deceit upon persons.

72.     By virtue of the foregoing, Robbins, directly or indirectly, violated, and unless enjoined, will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### CLAIM II
### Violations of Section 14(e) of the Exchange Act and Rule 14e-3 thereunder

73.     The Commission realleges and incorporates by reference paragraphs 1 through 72, as though fully set forth herein.

74.     Prior to the public announcement of the tender offers for Millennium and Sepracor and after a substantial step or steps to commence each of the tender offers had

been taken, Robbins purchased securities of Millennium and Sepracor while in possession of material information relating to the tender offers, which information he knew or had reason to know was nonpublic and had been acquired directly or indirectly from the offering company, the issuer, or any officer, director, partner, or employee, or other person acting on behalf of the offering companies or issuer.

75.     By reason of the conduct described above, Robbins violated, and unless enjoined, will again violate, Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Exchange Act Rule 14e-3 [17 C.F.R. § 240.14e-3] thereunder.

**RELIEF SOUGHT**

**WHEREFORE**, the Commission respectfully requests that this Court enter a Final Judgment:

**I.**

Permanently restraining and enjoining Robbins, his officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Exchange Act Rule 14e-3 [17 C.F.R. § 240.14e-3] thereunder;

**II.**

Ordering Robbins to disgorge, with prejudgment interest, all illicit trading profits or other ill-gotten gains received as a result of the conduct alleged in this Complaint.

### III.

Ordering Robbins to pay civil monetary penalties pursuant to Section 21A of the

Exchange Act [15 U.S.C. §78u-1]; and

### IV.

Granting such other and further relief as this Court may deem just and proper.

Dated: New York, New York
       September 23, 2013

Sanjay Wadhwa
Senior Associate Director
Attorney for Plaintiff
SECURITIES AND EXCHANGE
COMMISSION
New York Regional Office
3 World Financial Center, Suite 400
New York, New York 10281
(212) 336-0181
Wadhwas@sec.gov

Of Counsel:

Amelia A. Cottrell (Cottrella@sec.gov)
Charles D. Riely (Rielyc@sec.gov)